**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**AMY J. PRUITT,**

     **Plaintiff,**

**vs.**                         **CIVIL ACTION NO. 2:16-CV-05722**

**NANCY A. BERRYHILL,[1]
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security which <u>partially</u> denied the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered June 27, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 17 and 20.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings (Document No. 17.), **DENY** Defendant's request to affirm the decision of the Commissioner (Document No. 20.); **REVERSE** the final decision of the

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Commissioner and **REMAND** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Amy J. Pruitt (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on June 26, 2012, alleging disability since May 20, 2012 due to "upper tibial fracture reflex sympathetic dystrophy, knee injury to left leg, and RSD in left leg due to knee injury".[2] (Tr. at 179.) Her claim was initially denied on August 20, 2012 (Tr. at 104-108.) and again upon reconsideration on December 10, 2012. (Tr. at 110-116.) Thereafter, Claimant filed a written request for hearing on January 15, 2013. (Tr. at 117-118.) An administrative hearing was held on June 19, 2014 before the Honorable Toby J. Buel, Sr. (Tr. at 37-74.) On October 2, 2014, the ALJ entered a partially favorable decision finding Claimant was entitled to a period of disability and disability insurance benefits ending on November 18, 2013. (Tr. at 16-36.) On November 28, 2014, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 14-15.) The ALJ's decision became the final decision of the Commissioner on February 5, 2016 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6.) After having requested and being granted an extension of time to file a civil action (Tr. at 10-12, 7-9.), on June 27, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 17.), in response, the Commissioner filed a Memorandum in Support of Judgment on the Pleadings

---

[2] In her Disability Report – Appeal, submitted on January 15, 2013, Claimant alleged that since her last Disability Report dated August 24, 2012, she experienced increased pain and limited mobility. (Tr. at 220.)

(Document No. 20.), to which Claimant filed a reply. (Document No. 21.) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 42 years old on November 19, 2013, the date the ALJ determined her disability ended; she would be defined as a "younger person" by the Regulations on the date last insured ("DLI"). See 20 C.F.R. § 404.1563(c). (Tr. at 46.) Claimant has at least a high school education plus two years of college. (Tr. at 49.) Claimant primarily performed office work during the fifteen year relevant time-period, which included answering phones, scheduling appointments, or handling payroll and taxes for her employers. (Tr. at 51.) She stopped working when she broke her leg. (Tr. at 52.)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id.

§ 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such

factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2017. (Tr. at 23, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since May 20, 2012, the date Claimant became disabled. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that from May 20, 2012 through November 18, 2013, the period during which Claimant was disabled, she suffered from the following severe impairments: residuals of left tibial plateau fracture and reflex sympathetic dystrophy. (Tr. at 24, Finding No. 3.) At the third inquiry, the ALJ concluded that **from May 20, 2012 through November 18, 2013**, the severity of Claimant's impairments met the criteria of Section 1.03 of 20 C.F.R. Part 404, Subpart P, Appendix 1, **that Claimant was under a disability during that time period**, and that she had not developed any new impairment since November 19, 2013, and that her current severe

6

impairments were the same as those present from May 20, 2013 through November 18, 2013. (Tr. at 24, 26, Finding Nos. 4, 5, 6.)

However, the ALJ found that **beginning on November 19, 2013**, Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 27, Finding No. 7.) Further, the ALJ found that Claimant's impairments were medically improved, thus ending her disability as of November 19, 2013; the ALJ also found that Claimant's medical improvement related to her ability to work because her impairments or combination thereof no longer met or equaled the severity of a listing. (Tr. at 28, Finding Nos. 8 and 9.) The ALJ then found that **beginning November 19, 2013**, Claimant had the residual functional capacity ("RFC") to perform light work as defined in the Regulations

> except she could stand only 4 hours at a time. She could never climb ladders, ropes, and scaffolds. She could occasionally climb ramps and stairs as well as balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to heights, moving machinery, hazards, temperature extremes, and vibration. She would be afflicted with chronic pain noticeable to herself at all times but she could maintain attention and concentration in 2-hour increments. (Id., Finding No. 10.)

At step four, the ALJ found that **beginning November 19, 2013**, Claimant was capable of performing her past relevant work as an office clerk and employment representative and that this work did not require the performance of work-related activities precluded by her current RFC. (Tr. at 30, Finding No. 11.) Finally, the ALJ determined Claimant's disability ended on November 19, 2013. (Tr. at 32, Finding No. 12.)

**Claimant's Challenges to the Commissioner's Decision**[4]

As an initial matter, Claimant argues that the ALJ did not properly consider her medically

---

[4] The appeal herein **only** concerns the ALJ's decision finding Claimant no longer disabled beginning November 19, 2013.

determinable impairment of RSD under Social Security Ruling 03-2p after November 18, 2013, because he would have been compelled to find her pain and limitations due to RSD precluded employment. (Document No. 17 at 9-11.) Next, the ALJ failed to provide "good reasons" for not giving Claimant's treating physician's opinion controlling weight by "cherry picking" parts of the medical evidence that supported his finding, and without providing persuasive contrary evidence as required under the Regulations. (Id. at 11-14.) In addition, Claimant contends that had the ALJ not ignored SSR 03-2p, he would have recognized that conflicting evidence in the medical record, including the physical therapy notes, is not unusual in cases of RSD, therefore, his discounting Dr. McCleary's opinion[5] is unsupported by substantial evidence. (Id. at 15.)

Finally, Claimant argues that the ALJ performed an inadequate analysis of her credibility and allegations of pain as he only focused on the objective evidence of record that supported his decision, in contravention to the enumerated factors listed under SSR 97-7p and 20 C.F.R. § 404.1529. (Id. at 15-16.) Claimant asserts this error was more egregious because the ALJ neglected to adhere to the directives of SSR 03-2p which states: "a 'degree of pain reported is out of proportion to the severity of the injury sustained by the individual.'" (Id. at 16-17.) Claimant asks that this matter be reversed and remanded for an award of benefits, or alternatively, be remanded so that the Commissioner can correct the errors made below. (Id. at 17.)

In response, the Commissioner argues that the ALJ correctly determined that Claimant's disability ended after November 18, 2013 because the evidence showed that her condition had medically improved, and her RSD diagnosis neither met any Listings, nor was there any evidence

---

[5] Claimant cites this Court's decision in Ooten v. Colvin, 2016 WL 3511972, at *10 (S.D.W.Va. May 25, 2016) in support of her contention that an ALJ's failure to properly credit the opinion of a treating physician warrants remand; in that case, the ALJ gave "no weight" to the claimant's physician who had been treating him for fifteen years, and did not provided "good reasons" to justify the discount to the physician's opinion. (Id. at 15.)

of a functional loss due to her RSD. (Document No. 20 at 5-8.) Further, the Commissioner contends that the ALJ gave the appropriate weight to the opinion evidence. (Id. at 8.) The ALJ also gave good reasons for discounting Dr. McCleary's extreme opinion because his treatment notes as well as the physical therapy treatment notes indicated that Claimant's impairments improved from before and continued to improve after her disabling conditions no longer caused functional losses. (Id. at 9-10.) The Commissioner also contends that the ALJ properly found that Dr. McCleary's opinion was inconsistent with the overall evidence of record. (Id. at 10.) Moreover, the Commissioner asserts that the opinion evidence from Claimant's physical therapist, PTA Summers, is considered an "other source" under the Regulations, and cannot establish a medically determinable impairment or give a medical opinion. (Id.) Because the Regulations do not require an ALJ to assign weight to a physical therapist's opinion, and because PTA Summers's opinion was also inconsistent with his own progress notes, the ALJ appropriately gave it little weight. (Id. at 11-12.)

Finally, the Commissioner asserts that the ALJ analyzed Claimant's credibility and allegations of pain under the correct legal standards and found that her conservative treatment and the objective medical evidence did not support extreme limitations in her ability to function. (Id. at 12-13.) The ALJ accounted for Claimant's credibly established limitations and reduced her RFC to a range of light work, which the VE opined that she was capable of performing. (Id. at 13-14.) In sum, the Commissioner requests the Court affirm the ALJ's decision. (Id. at 14.)

Claimant asserts in reply that the Commissioner ignores the applicability of SSR 03-2p, and like the ALJ, ignores the evidence relating to her RSD. (Document No. 21 at 1.) Moreover, Claimant had been participating in physical therapy beyond the date the ALJ determined she was

no longer disabled, which would have caused her to be absent from work, and that after the conclusion of her twelve week course of physical therapy, Dr. McCleary found evidence of RSD. (Id. at 2.) Claimant contends that the evidence showed that she was not yet able to return to work as of November 19, 2013 on account of the physical therapy Dr. McCleary treatment notes, and that had the ALJ given SSR 03-2p the proper attention, he would have concluded that Claimant was disabled by RSD. (Id. at 2-3.) There was also no persuasive contrary evidence in this case, and Dr. McCleary's opinion was entitled to at least great weight. (Id. at 3.)

Claimant's treatment consisted of physical therapy long after the ALJ found she was no longer disabled, and there is no surgical treatment for RSD, thus, his analysis of her treatment with respect to RSD is unclear. (Id. at 4.) The ALJ did not provide sufficiently specific explanations for why he found Claimant less than credible, and only focused on objective evidence he believed discredited her allegations without support for his conclusions. (Id. at 4-5.) Again, Claimant prays for reversal and remand for an award of benefits or for remand to correct these errors. (Id. at 5.)

### The Relevant Evidence of Record[6]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Treating Physician Records:

Claimant fell and injured her knee on May 20, 2012. (Tr. at 341.) After x-rays revealed a left tibial plateau fracture, Robert McCleary, D.O., performed an open reduction and internal fixation two days later. (Id.) Records dated June 25, 2012 indicate that Claimant developed some hypersensitivity consistent with RSD in her left leg after her fracture, which resulted in pain,

---

[6] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

numbness, and a pins and needles sensation in her leg. (Tr. at 342.)

By November 28, 2012, Claimant had fewer RSD symptoms. (Tr. at 399.) Dr. McCleary prescribed medications and recommended she start physical therapy. (Tr. at 403.) On February 27, 2013, Dr. McCleary noted that Claimant's leg was only mildly hypersensitive and that she had fewer symptoms of RSD. (Tr. at 397-398.) She had no joint swelling, 4/5 muscle strength, good pulses distally, and positive capillary refill. (Tr. at 400.) Dr. McCleary recommended RSD injections from a pain management specialist, but Claimant refused. (Tr. at 398, 559.)

On September 24, 2013, Claimant underwent a left total knee replacement/arthroplasty, with removal of the tibial hardware. (Tr. at 415, 420-422.) During post-operative physical therapy, she reported doing much better; six weeks after her total knee replacement, Claimant was walking without a walker or crutches. (Tr. at 538.) She complained of some muscle spasms, and the RSD that was present before surgery "is resolving greatly". (Id.)

On May 12, 2014, eight months out from her knee replacement surgery, Dr. McCleary noted that Claimant was suffering again from RSD symptoms (Tr. at 532.) even though RSD had been resolving following surgery. (Tr. at 538.) While Dr. McCleary noted that Claimant was recovering nicely from her surgery with good range of motion and muscle strength, he noted that she was still having hypersensitivity in her lower leg, therefore, he increased her pain medication (Norco) and prescribed Valium as well as a topical pain relieving cream. (Tr. at 532-533.)

Physical Therapy Records:

From June 27, 2012 through September 18, 2012, Claimant participated in physical therapy. (Tr. at 242-279.) During this time, she was instructed to not bear weight on her left leg until late July 2012. (Tr. at 250.) Even after starting weight-bearing activities and completing

physical therapy in September 2012, Claimant continued to walk with an antalgic gait using a single crutch. (Tr. at 276.)  Also in September 2012, she was diagnosed with RSD of her left lower extremity. (Tr. at 274.)

When Claimant was initially evaluated by a physical therapist on October 30, 2013, it was noted that she had a severe problem with squatting past 45 degrees of flexion, could climb stairs using a single step strategy, could not run, had a pain level of 5 out of 10 at best and 7 out of 10 at worst. (Tr. at 476.) Her knee range of motion was normal, but she had a mild accessory motion deficit and her strength was rated at 3 out of 5 (moderate). (Tr. at 477.) The physical therapist noted that she had atrophy of the left thigh muscle that resulted in an antalgic gait. (Id.) A plan of care and intervention strategy was devised where the physical therapist's opinion that her rehabilitation potential to achieve functional goals was good. (Id.) The plan included physical therapy at an interval of three visits per week for eight weeks. (Tr. at 478.)

Claimant's physical therapy sessions were forty-five to fifty minutes in duration, during which she performed a number of exercises and stationary bicycling intended to strengthen her muscles and improve her function. (Tr. at 479-529.) During her third post-operative session, PTA Summers noted increased range of motion and that she tolerated all treatment modalities well. (Tr. at 482.) By visit number four, Claimant reported left knee pain, but "[f]unctionally, she reports she is able to perform her daily tasks without incident" although at a very slow pace. (Tr. at 483.) PTA Summers noted that Claimant had made "good gains since starting treatment on 10/31/13. She has attended 3 sessions and appears highly motivated to return to her prior level of function" and that despite continued swelling and pain, it "has not limited her activities or exercises". (Tr. at 484.) On November 11, 2013, PTA Summers again noted improved left knee range of motion. (Tr. at

485.) During a therapy session on November 13, 2013, Claimant reported that she had increased knee pain, and that she had spent most of the night before and that day in bed, however, PTA Summers observed continued steady gains in her range of motion. (Tr. at 487.) On November 14, 2013, she reported that her pain level was 6 out of 10 and it was along the anterior surface of her tibia down into her ankle, however, PTA Summers observed improved range of motion and quadriceps tone. (Tr. at 489.)

By November 22, 2013, Claimant had just minimal swelling along the medial knee joint line, good tolerance to all exercises, and increased passive range of motion to 120 degrees of knee flexion. (Tr. at 493.) PTA Summers's treatment note dated November 26, 2013, noted that she had increased swelling in her leg after wearing "high heels" the day before, however, it also indicated that Claimant continued to make good gains in range of motion and was progressing towards all rehabilitation goals. (Tr. at 495.) On December 3, 2013, Claimant reported she was able to walk on uneven surfaces for several hours the other day with no difficulty, "however afterwards her swelling increased along with her pain." (Tr. at 497.) On December 12, 2013, the physical therapist noted that Claimant had shown improvement in her range of motion, but she continued to have pain and difficulty with activity. (Tr. at 501.) During therapy sessions on December 23 and 27, 2013, Claimant reported decreased pain, and had some increased swelling with activities, but she continued to demonstrate good motion. (Tr. at 508, 510.)

On February 6, 2014, she noted that she was very tired and sore after her physical therapy session the day before (Tr. at 520.), and on February 18, 2014, she rated her pain at a higher level than she had at her initial evaluation in October, at 6/10 to 9/10. (Tr. at 524.), however, she also reported "with no new complaints today." (Id.) The next day, on February 19, 2014, she reported

that she had numbness along her tibia and down to her foot over the past several days (Tr. at 526.), and it was also noted that "[t]he patient was able to successfully complete additions and progress to the treatment program without a reported increase in pain. (Tr. at 527.)

Treating Physician Opinion Evidence:

On June 25, 2014, Dr. McCleary completed a Physical Residual Functional Capacity Questionnaire. (Tr. 642-647.) Dr. McCleary opined that due to Claimant's left knee traumatic arthritis, she had symptoms of pain, spasm and weakness in her left knee/leg daily and precipitating factors were walking and squatting. (Tr. at 642.) Dr. McCleary noted that clinical findings and objective signs were hypersensitivity, full knee range of motion, and 4/5 muscle strength, and treatment consisted of narcotics and a referral to pain management. (Id.) Dr. McCleary noted that Claimant was not a malingerer, that her depression and PTSD did contribute to the severity of her symptoms, and that her impairments were reasonably consistent with the symptoms and functional limitations that he opined. (Tr. at 643.) Dr. McCleary opined that Claimant experienced pain that was severe enough to interfere with the attention and concentration needed to perform even simple work tasks on a frequent basis. (Id.) He also believed that she was capable of only low stress jobs. (Id.)

Dr. McCleary opined that Claimant could walk one block without rest or severe pain, she could sit about two hours and stand less than two hours, total, in an eight hour day, and she would need to be able to walk around about every twenty minutes for ten minutes at a time. (Tr. at 644-645.) He also noted that she would also need to take unscheduled fifteen-minute breaks about every hour and that she needed to elevate her legs at waist high level forty to fifty percent of the workday. (Tr. at 645.) While engaging in occasional standing/walking, Dr. McCleary opined that

Claimant did not require a cane or other assistive device. (Id.) Dr. McCleary limited Claimant to lifting less than ten pounds occasionally (Id.); she could twist occasionally, rarely stoop, and never crouch/squat, climb ladders, or climb stairs. (Tr. at 646.) He estimated that her impairments were likely to result in an absence from work more than four days per month and that it was his expert opinion that she would not be capable of working a full-time work schedule at any level of exertion. (Tr. at 646-647.)

<u>Physical Therapist Opinion Evidence:</u>

One of Claimant's physical therapists, David Summers, PTA, wrote a letter dated June 18, 2014, outlining his observations of her during her physical therapy treatment. (Tr. at 637.) PTA Summers stated that the amount of pain she experienced during that period made her depressed and she had a "very poor outlook on life" because she believed she would be unable to return to her prior level of functioning. (Id.) PTA Summers opined that Claimant would "not be able to return to a pain free and high level of function" and that the last time he treated her, she demonstrated decreased range of motion, poor to fair muscle strength, and poor balance. (Id.) Additionally, PTA Summers opined that Claimant "would not be able to participate in a job or activity and be safe or run the risk of further injury." (Id.)

**The Administrative Hearing**

<u>Claimant Testimony:</u>

Claimant testified that her date of birth was July 31, 1971, that she was almost five feet, six inches tall, and that she weighed about one hundred and fifty pounds (Tr. at 46-47.) She testified that she weighed about one hundred twenty-five pounds on the date she alleged she became disabled, a little over two years earlier. (Tr. at 47.) Claimant stated that she was right handed and

that she was divorced. (Id.) She stated that she lived in a house that she made payments on and that her twenty year old son stayed with her occasionally. (Tr. at 47-48.) She stated that her source of income was alimony and the financial help of family and friends. (Tr. at 48.) Claimant testified that she had a driver's license and she drove herself to her hearing. (Id.) She testified that she drove an average of ten miles per week. (Tr. at 49.)

Claimant testified that she had a high school equivalency education plus two years of college. (Id.) She stated that she could read and write and do very simple addition and subtraction (Id.) She stated that if she were awarded benefits she could manage them in a responsible manner. (Tr. at 50.) She stated that she could tell if the change returned for a purchase was accurate, she could buy a money order to pay a bill, and she could keep a checking account balanced. (Id.)

Claimant testified that she was not working at the time of the hearing and that she had not worked since May 20, 2012. (Id.) She stated that from May 20, 1997, to May 20, 2012, she was sure she was doing some type of office work, but could not remember the specifics all the way back to 1997. (Id.) She stated that she worked at some assembly line factory jobs during that time frame. (Tr. at 51.) She described the office work she did as answering telephones, setting appointments, and handling payroll, noting that she worked for a couple of doctors and also had worked at Job Service as a customer service representative helping people find jobs. (Tr. at 51, 69.) She stated that her last job was at an auto glass shop from 2005 to 2012 and she was the assistant office manager. (Tr. at 51.) She stated that the job ended because she ended up in the hospital with a broken leg; it was not a worker's compensation related injury. (Tr. at 51-52.) She stated that she was not ever able to return to work. (Tr. at 52.)

Claimant testified that she had a plate and nine screws put in her leg after it was broken,

but her body started rejecting the metal and she had to have a knee replacement. (Id.) She went through physical therapy after her knee replacement surgery, first using a walker and then a cane. (Id.) She stated that she could walk unassisted occasionally starting about three months after her surgery, but she still needed to use the cane to maintain her balance when her reflex sympathetic dystrophy flared, even up until the time of the hearing. (Tr. at 53.) She stated she used the cane two or three times per week. (Id.)

Claimant testified that her daily activities included straightening her house up as she could, sitting outside in the sun for awhile, taking care of feeding her pets, and sometimes talking to someone on the phone. (Tr. at 53-54.) She stated she was afraid to go out into her unleveled yard and she was afraid of going out into a big crowd because she feared falling or getting knocked down. (Tr. at 54.) She said that she went from being someone who loved being around people to somebody who was scared to death to go out and be around people. (Id.)

Claimant testified that she could take care of her personal hygiene and fix simple meals for herself. (Id.) She stated that she did not go grocery shopping by herself because she forgot what she went into the store as a result of getting flustered if the store was crowded; she said her mom usually took her to get groceries. (Tr. at 54-55.) She stated that she did light housework and laundry. (Tr. at 55.) She stated that she did not lift a laundry basket for fear of losing her balance, but instead took a few items at a time out of the basket and put them into the washing machine. (Tr. at 62-63.) Claimant testified that there were days that she did not feel well enough to do housework and she lay in bed all day and cried; she estimated that happened about every two weeks. (Tr. at 63.) She stated that unless she was going somewhere she did not get dressed. (Tr. at 63-64.) She stated that if she went outside to sit in the sunlight, she almost always took a phone

with her so she could call for help if needed. (Tr. at 55.) She stated that she also watched scary movies and dramas on television and she noted that she could keep track of the plot as long as it was not complicated and did not involve too many characters. (Tr. at 55-56.)

Claimant testified that she did not sleep well and took Seroquel to help her sleep. (Tr. at 56.) She stated that she usually fell asleep around midnight or 1:00 a.m., but woke up throughout the night and was usually wide awake by at least 7:00 a.m. (Id.) She estimated that she got five to six hours of sleep in a twenty-four hour period of time. (Id.)

Claimant stated that she was unable to perform her past job because it required her to go upstairs and "out back" to look for windshields and to run around the office and help customers bring in their vehicles. (Tr. at 56-57.) She stated that she also had to sit for long periods of time and could not leave because she was often there by herself. (Tr. at 57.) She stated that she could not walk very quickly and could not run, she got confused very easily, and she got overwhelmed very easily. (Id.)

Claimant testified that her pain interfered with her ability to work. (Id.) She stated that she had severe muscle spasms in her leg to the point that it drew up her toes and she had shooting pains in that leg. (Id.) She stated that she had "serious sensitivity issues from the RSD" and had severe pain in her ankle. (Id.) She stated that she could not sit for very long without having to change positions constantly or standing up and that she could not stand very long before she had to sit down. (Id.) She described the pain as a constant throbbing that at times became more excruciating. (Id.) She testified that on a scale of one to ten, her pain intensity stayed at a level six most of the time, and when it got severe, it was a level ten. (Tr. at 58.)

Claimant described the manner in which she was sitting at the hearing, which involved

18

shifting around so she could "get it where it is not hurting as bad." (Id.) She said that she "hated to stand up and try to answer questions because they are having trouble with their microphones, but it is really hard to sit this long." (Id.) She testified that she was sitting with her weight on her right side and minimizing the weight she put on her left side because that helped a little bit with her pain. (Tr. at 59.) She stated that she was trying to take the pressure off the left leg to keep it from getting completely flared up, but that nothing really made the pain stop – it was constant. (Id.) She stated that if she stood her knee would not hurt as bad, but if she stood for a few minutes it would start hurting from standing and then she would have to sit again. (Id.) She stated that on a good day she could stand ten minutes without being in excruciating pain, and that she could walk without her cane about a block on a good day when the pain was not too intense, but that she would limp when walking. (Tr. at 59-60.) She testified that she used her cane at home, also, on bad days, but on good days she tried to just be careful and not use the cane. (Tr. at 60.) She stated that she used it for balance when standing sometimes and that she held the cane in her right hand. (Tr. at 60-61.)

Claimant testified that she could not bend to lift with her knees so she had to lift with her back, but if an item was very low, she could not get down to pick it up. (Tr. at 61.) She stated that her stepdad or her mom helped carry groceries, but she did lift a gallon of milk when cooking, although she did not carry the gallon of milk. (Id.) She attributed her inability to carry a gallon of milk to her balance problems. (Id.) She stated that when she walked she drifted to the left. (Id.) Claimant testified that she had exercises that she did at home for her knee. (Tr. at 62.)

Claimant testified that she sees her mom about every day because her mom came to her house to check on her. (Tr. at 64.) Claimant said that she and her mom usually visited for about an

hour when she came over and that she got along well with her. (Id.) She stated that she did not "go around most people", however. (Tr. at 64-65.) She stated that she had lost her friends because of her inability to do things that she used to do and that she had lost her marriage for that reason. (Tr. at 65.) She said that she did not often go out socially. (Id.) She acknowledged that she had become suicidal at one point and she still occasionally had bad thoughts, but did not act on them for the sake of her children. (Id.)

Claimant testified she had lost the health insurance she had through her ex-husband for awhile and had to go through the process of obtaining a medical card; she did not see her doctor while she was uninsured. (Tr. at 66.) She stated that even when she had the insurance she had to pay someone to drive her to the doctor's office, pay a co-pay, and pay for medication and she had trouble finding the money to do all of that even before her insurance was dropped completely. (Id.) She stated that she had to stop taking her psychiatric medications while she was uninsured due to the cost, but she had gotten them re-prescribed and started taking them again when she qualified for a medical card. (Id.) She stated that the medication had helped her depression but did not eliminate it. (Tr. at 66-67.)

Claimant testified that she had anxiety any time she became stressed or overwhelmed and that it made her confused, forgetful, and flustered. (Tr. at 67.) She gave as an example going to Walmart and being in tears within ten minutes because of the crowd of people making her panicky; she stated she tried to avoid going to large stores like Walmart. (Tr. at 67-68.)

Anthony T. Michael, Vocational Expert ("VE") Testimony:

The VE testified that Claimant had worked as an office clerk or receptionist at the auto glass shop and other employers and that the job was classified as a sedentary semi-skilled job. (Tr.

at 69-70.) He stated her job as an employment representative was also classified as a sedentary skilled job. (Tr. at 70.) He stated that she had worked as a payroll clerk at the auto glass shop and that position was also sedentary and skilled. (Id.) He testified that Claimant's job at Job Service would have given her transferable skills for a sedentary job such as an interviewer. (Id.)

The ALJ asked the VE to assume an individual of the same age, education, and work history as Claimant, who was limited to no more than light exertional work although she could only stand four hours at a time "so it is somewhat sedentary", and who could never deal with ladders, ropes, or scaffolding; who could occasionally do all the other posturals; who should avoid concentrated exposure to heights, moving machinery and hazards, temperature extremes, and vibration; who would be afflicted with chronic pain noticeable to herself at all times, but who could maintain attention and concentration in two hour increments. (Tr. at 71.) The ALJ then asked the VE whether the described individual could perform Claimant's past work or jobs that utilized her transferable skills. (Id.) The VE testified that the individual could perform Claimant's work, the transferable skills job, and unskilled jobs at the light and sedentary exertional levels. (Id.) The VE testified that jobs that could be performed would be a nongovernmental mail clerk, office helper, and routing clerk at the light level and surveillance system monitor, charge account clerk, and retail order clerk at the sedentary level. (Tr. at 72.)

The VE testified that if the individual described in the first hypothetical was off task for an extra fifteen minutes per day outside of normal breaks and lunch, then the individual would be unable to maintain any type of employment. (Tr. at 72-73.) Additionally, the VE testified that if the individual described in the first hypothetical were to miss work one day per month, on average, she would be unable to maintain employment. (Tr. at 73.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

Analysis

As previously stated, Claimant argues that the ALJ's decision finding her no longer disabled as of November 19, 2013 is not supported by substantial evidence because: (1) the ALJ failed to properly consider her reflex sympathetic dystrophy ("RSD") with respect to SSR 03-2p; (2) the ALJ improperly evaluated the opinions provided by her treating physician and physical therapist; and (3) the ALJ improperly discounted Claimant's credibility and her allegations of pain. (Document No. 17 at 7.)

<u>Social Security Ruling 03-2p and Reflex Sympathetic Dystrophy:</u>

At step-two of the sequential evaluation, the ALJ already determined that Claimant suffered from RSD as a severe impairment[7]; Claimant directs the Court's attention to the guidance SSR 03-2p provides to adjudicators when evaluating cases involving RSD, which she contends the ALJ ignored in his evaluation of her continued disability from this impairment:

> [RSD] may be the basis for a finding of "disability." Disability may not be established on the basis of an individual's statement of symptoms alone.

> Transient findings are characteristic of [RSD], and do not affect a finding that a medically determinable impairment is present.

SSR 03-2p, 2003 WL 22399117, at *4.

> It should be noted that conflicting evidence in the medical record is not unusual in cases of [RSD] due to the transitory nature of its objective findings and the complicated diagnostic process involved. Clarification of any such conflicts in the medical evidence should be sought first from the individual's treating or other medical sources.

> The signs and symptoms of [RSD] may remain stable over time, improve, or worsen. Documentation should, whenever appropriate, include a longitudinal clinical record containing detailed medical observations, treatment, the individual's response to treatment, complications of treatment, and a detailed description of how the impairment limits the individual's ability to function and perform or sustain work activity over time.

<u>Id</u>. at *5.

Pursuant to 20 C.F.R. § 402.35(b)(1), once they are published, Social Security Rulings are binding on all components of the SSA and represent precedent final opinions and orders and

---

[7] Claimant points out that at least one district court case within the Fourth Circuit remanded a matter partly due to the ALJ's failure to incorporate RSD's characteristics into the claimant's credibility determination. (Document No. 17 at 17.) That case, <u>Pierce v. Colvin</u>, 2014 WL 1319108 (D.S.C. March 31, 2014), is distinguishable from the one at bar because the ALJ therein <u>at no time</u> considered the claimant's RSD diagnosis at step two of the sequential evaluation, therefore, any consideration of the syndrome's characteristics in the credibility analysis was absent from the decision. In Claimant's case, the ALJ expressly found that despite her severe impairments, including RSD, her condition medically improved. (Tr. at 28.)

statements of policy and interpretations adopted by the SSA, however, there is no requirement that the Rulings themselves must be cited in an ALJ's written decision. What is required, however, is that the ALJ's decision be based upon a correct application of the relevant law, and be supported by substantial evidence. See Chater v. Craig, 76 F.3d 585, 589 (4th Cir. 1996).

In the written decision, the ALJ discussed the evidence that dated from November 19, 2013 through the date of the decision that was pertinent to Claimant's RSD, beginning with his determination that Claimant's tibial fracture residuals and RSD symptoms did not meet or equal the criteria under Listings 1.02 and 1.03. (Tr. at 28.) The ALJ further found that Claimant's RSD did not meet or equal any of the neurological criteria under Listing 11.00. (Id.) In short, though the ALJ did not explicitly cite SSR 03-2p, it is evident that Claimant's symptoms from RSD were discussed at length throughout the analysis of the opinions provided by her medical providers, the medical evidence of record, and ultimately, the credibility determination. However, the undersigned agrees with Claimant that SSR 03-2p is applicable to this case and that its guidance is material to the issues on appeal.

Evaluating Opinion Evidence:

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed

against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 404.1527(c)(2).

Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make

findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record

as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v.

Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling

weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the

factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). These factors include: (1) Length of the treatment

relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3)

Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the

Regulations state that the Commissioner "will always give good reasons in our notice of

determination or decision for the weight we give your treating source's opinion." Id. §

404.1527(c)(2).

Of importance here, SSR 03-2p provides additional guidance on the subject of opinion

evidence:

> Opinions from an individual's medical sources, especially treating sources,
> concerning the effect(s) of [RSD] on the individual's ability to function in a
> sustained manner in performing work activities, or in performing activities of daily
> living, are important in enabling adjudicators to draw conclusions about the severity
> of the impairment(s) and the individual's RFC. In this regard, any information a
> medical source is able to provide contrasting the individual's medical condition(s)
> and functional capacities since the alleged onset of [RSD] with the individual's
> status prior to the onset of [RSD] is helpful to the adjudicator in evaluating the
> individual's impairment(s) and the resulting functional consequences.

2003 WL 22399117 at *7.

25

In this particular case, the ALJ expressly gave Claimant's treating physician's June 2014 opinion "little weight", in which Dr. McCleary concluded she was capable of "less than sedentary activities, including restrictions to never perform most postural maneuvers and requirements to elevate her lower extremities up to 50% of a workday . . . [and capable of] sit[ting] or stand[ing] no more than 2 hours a day, while also missing more than 4 days of work per month due to pain." (Tr. at 29-30.) The reason given for the "little weight" was that the ALJ found Dr. McCleary's opinion was inconsistent with the treatment notes, including his own, "showing significant improvements" in Claimant's condition. (Tr. at 30.)

With respect to the requirements of the Regulations, the undersigned finds that the ALJ acknowledged Dr. McCleary as Claimant's treating physician (Tr. at 25, 30.), and although he did not specifically reference Dr. McCleary's specialty, the ALJ ostensibly acknowledged that Claimant had been under his care specifically for her left knee injury since May 2012 through June 2014 due to the numerous citations in the decision from the medical record. (Tr. at 24-25, 28-30.) With respect to Claimant's RSD, the ALJ noted the following "evidence of non-acute findings and conservative care fails to support the extreme limitations alleged" where: (1) "her fracture residuals and [RSD] both improved significantly following her September 2013 knee replacement"; (2) in October 2013, Claimant reported "her left knee pain was "doing better" since her arthroplasty (Exhibit 12F)"[8]; (3) physical therapy notes "continue to show improvement (Exhibit 12F, 15F)"[9]; and (4) Dr. McCleary found "claimant's RSD, which was present prior to surgery, was 'resolving greatly.'" (Tr. at 29.)

---

[8] The undersigned notes that Exhibit 12F contained physical therapy records dated October 30, 2013 to February 20, 2014 from Rebound Physical Therapy and Sports Performance, LLC. (Tr. at 476-529.)
[9] Exhibit 15F concerned office treatment records dated September 30, 2013 to October 29, 2013 from Boone Memorial Homecare. (Tr. at 563-636.)

The ALJ further noted that the evidence dated after November 2013 showed "continued improvements", including that Claimant reported not requiring an assistive device to ambulate, that her nighttime pain continued, but it "was improved", and that in physical therapy records from February 2014, she rated her pain as a 1-2 out of 10.[10] (Id.) Moreover, the ALJ acknowledged that Claimant participated in physical therapy sessions consisting of exercise for 45 minutes, "including using a bike for 10 minutes." (Id.) The ALJ finally noted that by May 2014, Dr. McCleary found Claimant's left knee had full range of motion, "4/5 strength, good pulses, normal capillary refill, no swelling, intact neurological findings, and no instability[]"; Dr. McCleary also advised Claimant to continue with her home exercises. (Id.)

The ALJ also acknowledged that the State agency medical consultants opined in August and December 2012 that Claimant remained capable of sedentary to light exertion. (Id.) Those opinions were given "little weight" for the period prior to November 18, 2013, due to being "without benefit of the fully developed record, such as the evidence received at the hearing" (Tr. at 25.), but were afforded "significant weight" for the period after November 18, 2013 because they were "consistent with the treatment records showing improvement after she had adequate time to recovery [sic] from knee replacement." (Id.) In addition, the ALJ credited these opinions as such "based on the consultants' medical expertise, program knowledge, and supportive explanation." (Id.)

---

[10] The undersigned notes that the records indicate that Claimant had six (6) physical therapy sessions during the month of February 2014. (Tr. at 518-529.) With regard to her rating of pain, during that month, it was noted that "at rest", her pain was at 0/10 to 1-2/10, and "at worst" the "highest level of pain during the last 24 hours" was rated at 3-5/10 to 6-9/10. (Tr. at 518, 520, 522, 524, 526, 528.) After therapeutic exercises, there were no reports of increased pain or that Claimant was incapable of completing same. (Tr. at 518, 520, 523, 525, 527, 529.) The undersigned further notes that for each of physical therapy sessions during the month of February 2014, PTA Summers was Claimant's provider.

After this recitation of the medical evidence of record, for the period dating after November 18, 2013, the ALJ ultimately found Dr. McCleary's medical source opinion or "statement" that Claimant was more severely limited functionally was unsupported by his own treatment notes and with the other evidence of record "described above". (Tr. at 29-30.) However, with regard to Claimant's RSD, an impairment the ALJ deemed "severe", the undersigned finds that the ALJ focused on the contradictory or inconsistent evidence to discount Dr. McCleary's opinion. SSR 03-2p specifically warns adjudicators that inconsistencies in the medical evidence is "not unusual" with RSD, and to "first" seek out a treating physician's opinion in order to provide "clarification" for those conflicts. See, SSR 03-2p, 2003 WL 22399117, at *5. There is no evidence that occurred in this case, and because there is no argument that SSR 03-2p applies here, the ALJ should have explored these inconsistencies with Dr. McCleary prior to assigning his treating opinion less weight than those provided by the state agency consultants. Accordingly, the ALJ's decision concerning the evidence **beginning on November 19, 2013**, the evaluation of Dr. McCleary's opinion is not supported by substantial evidence.

Evaluating Credibility and Pain:

Social Security Ruling 96-7p[11] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 404.1529 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of

---

[11] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on October 2, 2014. See, SSR 16-3p, 2016 WL 1131509.

explaining the reasons for the finding about the credibility of the individual's statements. See, also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

As an initial matter, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.") Claimant argues that the ALJ's credibility rationale was based purely on his assessment of the objective evidence of record (Document No. 17 at 16.), however, the written decision indicates that was not entirely the case. The ALJ noted that Claimant testified that she continued to have persistent symptoms of pain, and that her RSD "results in leg numbness and balance difficulties". (Tr. at 28.) However, "[f]unctionally, she reported driving herself to the hearing", "lives with her 20-year old son part-time", and "her daily activities include straightening

around the house, preparing simple foods, going outside to sit in the sun, feeding pets, talking on the phone, doing laundry, watching television, and going shopping with her mother." (Tr. at 28-29.)

After properly performing the two-step process[12], the ALJ proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms, as noted *supra*. (Tr. at 29.) At the end of his analysis, the ALJ found that "all this evidence establishes the claimant's severe impairments improved after November 2013", and that "the objective medical evidence discussed above suggests the claimant has greater sustained capacity than she alleged". (Tr. at 29, 30.) The ALJ concluded that despite Claimant's "subjective complaints and alleged limitations" she retained the capacity for work activities outlined in the RFC. (Tr. at 30.)

> SSR 03-2p also provides guidance in determining credibility in cases involving RSD:
>
> [T]hird-party information, including evidence from medical practitioners who have provided services to the individual, and *who may or may not be "acceptable medical sources,"* is often critical in deciding the individual's credibility. Information other than an individual's allegations and reports from the individual's treating sources helps to assess an individual's ability to function on a day-to-day basis and helps to depict the individual's capacities over a period of time, thus serving to establish a longitudinal picture of the individual's status.

2003 WL 22399117, at *7. (emphasis added)

Indeed, as noted *supra*, the ALJ acknowledged the physical therapy records in his credibility analysis, as well as the opinion provided by Claimant's assistant physical therapist, David Summers. (Tr. at 30.) The ALJ recognized that PTA Summers had treated Claimant as well as his opinion that she "would not be able to perform 'high level' work due to multiple symptoms,

---

[12] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

including decreased knee range of motion, poor strength, and poor balance", and that PTA Summers "felt [Claimant] would not be able to participate in any job." (Id.) Although a physical therapist's opinion is not recognized as a "medical opinion" under the Regulations,[13] the ALJ proceeded to consider PTA Summers's opinion, as is permitted under these Regulations, as well as SSR 03-2p and SSR 06-3p. The ALJ gave the opinion "little weight", finding it "vague, non-specific, lay, and conclusory", but agreed with the opinion to the extent that Claimant could not perform "high level" work and accommodated that limitation in the RFC assessment. (Id.)

The ALJ's discussion of Claimant's allegations of pain and other symptoms, along with her own admissions of her daily activities, is illustrative that the ALJ reviewed the factors promulgated under 20 C.F.R. § 404.1529(c) in addition to the objective medical evidence to assess Claimant's credibility, and therefore appears adequate pursuant to the Regulations. Nevertheless, to the extent that the ALJ relied upon the inconsistencies in the medical evidence to discount the opinions provided by Dr. McCleary and PTA Summers, and to the extent that the ALJ failed to consider these providers' "critical" statements with respect to Claimant's credibility and day to day functioning as directed pursuant to SSR 03-2p, the undersigned finds that the decision concerning the evidence **beginning on November 19, 2013**, the ALJ's credibility assessment was inadequate and not supported by substantial evidence. Id.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court

---

[13] See 20 C.F.R. §§ 404.1513(d)(1), 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.")

**GRANT** the Claimant's Motion for Judgment on the Pleadings (Document No. 17.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 20.), and **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings with respect to the evidence **beginning November 19, 2013** in order for the ALJ to properly assess the treating physician's opinion, as well as to consider both the treating physician and physical therapist's statements "to establish a longitudinal picture of [Claimant's] status" as directed under SSR 03-2p.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d

91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: March 9, 2017.


Omar J. Aboulhosn
United States Magistrate Judge